TURMAN
vs.
WHITE'S HEIRS.

---

ORD. PET.

Case 31.

## Turman *vs.* White's heirs.

### APPEAL FROM LAWRENCE CIRCUIT.

1. One who enters as tenant for life cannot himself hold adversely to those in remainder, nor can those who enter under him.

2. D. W. by deed "gives and grants to S. W., during his life, and then to his heirs or executors," a tract of 325 arcres of land, described by its boundaries, "to have and to hold the said tract or parcel of land unto the said S. W., his heirs, and executors against the claim of said D. W., his heirs, executors, and administrators, unto the said S. W. during his life, then to his heirs forever." Held, that this deed conveyed to S. W. an estate for life only in the land, and upon his death to his heirs in fee.

3. The rule in Shelly's case, which in effect destroys the estate intended by the grantor to be conveyed, and converts a life estate into an estate in fee, by which the intention of the grantor is defeated, has no practical operation in Kentucky.

4. The rule in Shelly's case was rule of policy, not of construction, and established in England in subserviency to the feudal policy prevailing at the time, and to the interest of landlords.

5. The rule in Shelly's case has never been adopted as a rule of construction in Kentucky; only one case—*Humphreys v. Ayers, January*, 1852—recognizes the principle; in other opinions of this court there are intimations to the contrary, and in other cases, where the rule has been referred to, the cases were decided on other

points. *Prescot v. Prescot,* 10 *B. Monroe,* 52, and cases there cited; also, *Black v Cartmell,* 10 *B. Monroe.* 194.

6. The 10*th section of chapter* 80, *Revised Statutes, page* 541, gives effect to the limitation for life, and to the subsequent limitation to the heirs, showing that in this country the reason for refusing to give effect to such a limitation does not exist.

7. The rule of construing instruments to carry out the intention is to be adhered to, and that intention carried out so far as it can be done consistent with the rules of law. 2 *B. Monroe,* 166; 12 *B. Monroe,* 156.

8. A conveyance to one during life, and *then* to his heirs, gives the first taken a life estate, and his heirs at his death the fee.

This action by petition was brought by the heirs of Solomon White against several defendants, for the recovery of a tract of land in Lawrence county, of which the plaintiffs state that they are the owners, and entitled to the possession. Before the case came to trial, the action was dismissed as to all of the defendants except Turman, who, by his answer, denies the title of the plaintiffs, and alleges title in himself to the land in his possession, embraced in the boundary set out in the petition, and for the extent of his possession refers to his deeds. Upon the trial the plaintiffs read a patent dated in 1772, and issued by Gov. Dunmore, of Virginia, granting, in virtue of the proclamation of 1754, a large tract of land to John Savage and many other individuals, for military services, and a deed from the register of this state, dated in 1803, conveying to David White, father of said Solomon, a part of the same land, including that now in controversy; and after introducing evidence conducing to prove possession of the land in dispute in David White as early as 1804, read a deed from David to Solomon White dated in 1809, covering said land, and proved that possession was immediately taken and held by said Solomon and those claiming under him. They also proved that they were the heirs of said Solomon, and that he died in 1851, before this action was commenced. The defendant read various deeds by which he attempted to show a derivation of title from one of the grantees in the patent read by the plaintiffs, and also read a deed from Solomon White to John McIntyre, dated in 1813, and a chain of deeds

from McIntyre down to himself, all covering a part of the land; and relied further upon evidence conducing to prove that one Catlett, from whom also he derived title by a chain of deeds, had, about the year 1822, purchased the improvement of Solomon White, and thus, taken possession, avowing, however, that he had title himself, and disclaiming to enter or hold under White's title, and that the possession thus acquired had been continued down to the present defendant, under claim of title, and, as contended, adversely to all the world.

There being no proof that the grantor in the deed by which the defendant attempted to deduce title under the patent before referred to, was, as the deed professed, heir of one of the patentees, the court properly told the jury that no title passed by that deed. With regard to the nature of the possession taken by Catlett, and the effect of its continuance, and also as to the effect of an adverse possession by Turman, and those under whom he claimed, the court gave the instructions asked for by the defendant, allowing the jury to find that Catlett had taken an adverse possession by purchase of Solomon White's improvement, and on all points, except with respect to the deed from David to Solomon White, instructed the jury as moved for by the defendant. But the court refused to instruct the jury that the deed from David to Solomon White vested in the latter the absolute fee simple to the land thereby conveyed, so far as said David had title, and that the deed from Solomon White to John McIntyre conveyed an absolute fee simple so far as said Solomon and David were concerned, and that so far as that deed covers the land in contest, the law is for the defendant; but the court gave the instructions asked for by the plaintiffs, to the effect that "if the defendant, and those under whom he claims, had no possession of the land in contest, except that which they obtained from Solomon White after the date of the deed from David White to him, the statute of limitations did not run against the

plaintiffs until the death of Solomon White. But if, at the date of said deed from David White, the defendants, and those under whom they claim had possession of the land, claiming it adversely to the title of said Solomon and his vendor, and such possession continued adversely for more than twenty years, the plaintiffs cannot recover in this suit."

R. APPERSON, for appellant—

Argued, 1. That the rule in Shelly's case, which before the Revised Statutes was the rule in Kentucky, in Virginia, and in England, must govern this decision. The court are referred to the case of *Humphreys v. Ayres, manuscript opinion,* in which the rule is recognized. This is in accordance with the decisions of all the states as far as I have found. Chancellor Kent refers to the different decisions, and urges with great force the propriety of the rule—see *Kent's Com., vol.* 4, 214 *to* 233; see also, *Berry v. Williamson, &c.,* 11 *B. Monroe,* 245.

2. The circuit court erred in giving the instructions, and overruling some offered by appellant.

3. The evidence showed that Savage owned but one part out of sixty-one; David White acquired his interest only, and the court should not have rendered judgment in any event for more than one part out of sixty-one, and in no event was the jury justified in finding a general verdict as they did—the evidence, under the instructions of the court, could only warrant a finding for an undivided part. It is hardly necessary to refer to authority to sustain this proposition.

Indications have been given against the rule in Shelly's case, in cases of property claimed under wills. All know that deeds are not always to be construed as wills—the latter are frequently executed *in extremis,* without skill, the former should be considered as done with more deliberation.

It is contended that the possession was held adversely for near 40 years.

J. HARLAN, on the same side—

The appellant relies on the following grounds for reversal:

1. The verdict and judgment are not sufficiently specific.

2. The plaintiff below did not show title to the land sued for.

The deed relied on from David to Solomon White, of 1809, conveyed a fee simple to the latter, and 140 acres thereof was conveyed by Solomon White to J. McIntyre, in fee simple, and he to another, and down to Turman, all which deeds expressly convey an estate in fee simple.

There are various authorities to the following effect: "Though an estate for life only be expressly given to the devisee previous to the limitation to the heirs, the effect of the limitation will not, on that account, be prevented, for wherever an estate for life is granted, with a remainder to the heirs of the body of the grantee, it will be an estate of inheritance executed in the grantee, as where there is an estate of freehold limited to the ancestor, no subsequent limitation to his heirs, or the heirs of his body, can make them purchasers, but the grantee will be seized in fee, according to the subsequent limitation, though the first estate limited to him was an estate for life, granted by express words." *Crabb's Law of Property, Law Lib., vol.* 55, *page* 25; 5 *Bacon,* 573; *Stewart v. Kenon,* 2 *Watts & Sargent,* 288; *Carter v. McMichel,* 12 *Sargeant & Rawle,* 429; *Paxon v. Lefferts,* 3 *Rawle,* 73.

This rule is clearly defined—4 *Kent,* 215, 227. This rule has been adopted in South Carolina—1 *Bay.* 453; 1 *McChord,* 60. In North Carolina—3 *Ball;* 1 *Hawks,* 163; In Tennessee—9 *Yeager,* 209. In Virginia—2 *Wash.* 9. In Maryland—4 *Harris & Johnson,* 431; 6 *Ib.,* 364. In Pennsylvania—1 *Dallas,* 47; 3 *Binney,* 121, *and others.* In Ohio—5 *Hammond,* 461. In Georgia—9 *Law Rep.,* 67. Jarman says, that the rule in Shelly's case is a rule *of law,* and not of construction—2 *Jarman on Wills,* 178; 4 *Kent,* 228.

No evidence can be admitted of the language used
by the party, other than that expressed in the writing.
The writing is to be construed according to its techni-
cal meaning, not what the parties secretly intended.
1 *Greenlief*, *section* 277.   No extraneous proof can be
received—*Stephen v. Walker*, 8 *B. Monroe*, 602.  Words
must be construed according to their ordinary legal
meaning—*Goode v. Bradley*, *manuscript opinion*, *last
term*.

The *Revised Statutes*, *chapter* 83, *section* 10; changes
the common law on this question.  If the question
was to depend upon the statute the defendants in error
would succeed, but as the case occurred before the
Revised Statutes were adopted, it is not to be affected
by them.   But the question has been decided by this
court in the case of *Humphreys v. Ayres*, *manuscript
opinion*.   It is referred to as showing that this court
has affirmed the settled course of decision in similar
questions.   In that case the court say: "The com-
mon law doctrine is, that whenever the ancestor by
any gift or conveyance takes an estate of free-hold,
and there is afterwards in the same gift or conveyance,
a limitation to his *right heirs*, or to the heirs of his body,
the remainder vests in the ancestor, and though al-
though some other estate for life might interpose be-
tween his free-hold and such limitation to his heirs."
And in a subsequent part of the opinion the court say:
"The act of 1796 does not change this rule of the
common law."   So far, therefore, as this case is con-
cerned, the question is regarded as settled.

MOREHEAD & BROWN, for appellees—

The question that arises is, is the word *heirs* a word
of limitation or purchase, as used in the deed from D.
White to Solomon White?  It is too clear to require the
citation of authority, that this word, under different
circumstances, has different significations.   When it
is intended merely to mark the nature, extent, and
continuance of the estate, it is conceded to be a word
of limitation.   To become a word of limitation it

TURMAN
*vs.*
WHITE'S HEIRS.

must operate only to expand an estate in the ancestor, so as to admit the designated heirs into its extent, and entitled them to take derivatively through the ancestor as *the next* of succession; in other words, to use the language in the case of *Prescot v. Prescot's heirs*, 10 *B. Monroe*, 58, it must appear that the grantor intended to use the word as embracing the whole line of his heirs in succession, and not particular designated persons, who were to take under the general description. Whatever may be the *prima facie* inference of intention, it is now too well settled to be seriously questioned, that this inference may be overthrown by circumstances indicating a contrary intention. We contend that a contrary intention is very apparent in this case.

1. The land is given to Solomon White "*during his life*," which clearly imports during his life only.

2. The use of the word "*then*" imports that the word *heirs* should not have an expanding influence, to enlarge the life estate. The ancestor was to have it during life, and *then* it was to go to others.

3. The alternate grant, "then to his heirs or executors," renders it impossible to doubt that the actual intention of the grantor was that his son should have only a life estate, and at his death such persons as were then his heirs should take the estate, and if there were no such persons, then the executors.

4. It is contended that the rule in Shelly's case, as understood in England, never was law in this state, and that we have, by solemn adjudications, given a different meaning to the words *issue and heirs* from that which prevails there—*Moore v. Moore*, 12 *B. Monroe*, 561. The words dying without issue, or without heirs, without any qualifying or restraining expressions, was, in this last cited case, construed to mean a failure of issue at the death of the last taker, and not an indefinite failure of issue. This is conceded to be against the whole English decisions, as well as many of the states of the Union. See also, *Long v. Duval*, 6 *B. Monroe*, 219, which is to the same effect. No case can

be found in the judicial history of this state, where an estate has been clearly limited for life, where it has been expanded into a fee simple by operation of this rule.

The intention of the parties has always been permitted to prevail and govern the case. In *Thompson v. Thompson, 2 B. Monroe,* 166, it was held to be "allowable to look behind the instrument into the state and condition of the parties—their motives, object, and aim in its creation—as means of leading to a proper understanding of its import and cotemporaneous exposition; and the action of the parties under it is entitled to great weight, and should be conformed to, carried out, and sustained if it can be done without doing violence to its terms."

In this case Solomon White, the son, had eight children, and was, at the date of the deed, a dissipated man; and a bond had been given for a conveyance of the land to him for life, remainder to his children, and that the deed was attempted to be made in fulfillment of the bond.

5. The verdict is sufficiently certain—it is for all the land in Turman's possession, as set out in his answer, and the judgment is correct.

K. & S. FARROW, on the same side—

The proof shows very satisfactorily that the parties and draftsmen all understood and intended that a life estate only should be conveyed to Solomon White, with remainder to his children, which they understood to be synonimous with heirs.

The instruction asked by appellant of the circuit court, that an estate in fee passed to Solomon White by the deed from David White, was properly overruled. The term heirs in the deed, it is insisted, was a word of purchase and not of limitation.

The intention of the parties is the rule by which to construe instruments, whether deeds or wills, and in this case the intention to use the term heirs as a word of purchase, is manifest from the proved intention of the parties, as well as the deed itself. The rule in

Shelly's case has never been adhered to in Kentucky. In *Moore v. Moore*, 12 *B. Monroe*, 656, the court say : " That expositions are to be according to the common intendment is agreed by all. To whatever instru-. ment we may be giving a construction, the words which have been employed by the author should be taken in the sense in which he understood them ; and in cases in which technical rules have been applied to particular expressions by the courts, if we are satisfied after an examination of the instrument, those technical rules will not carry out, but defeat the intention of the author; the technical rules must yield to the intention, and such a construction must be given as will effectuate it." See also *Thompson v. Thompson*, 2 *B. Monroe*, 166, and *Means v. The Presbyterian Church*, 3 *Watts & Sargeant*, 303. These authorities sustain the court in refusing the instruction—See *Fern on Con. Remainders*, 209, and authorities cited.

The estate given by the deed to the heirs of Solomon White was a vested remainder, and no act of the tenant for life could defeat it—see *act of* 1798. The second instruction asked by Turman was properly refused also.

The finding of the jury was sufficient—See *Farrow, &c., v. Farrow*, 2 *J. J. Marshall*, 388 ; *Buckley v. Cunningham's heirs*, 4 *Bibb*, 285; 2 *Marsh.*, 254. The plaintiff must take possession at his peril, under the writ of *haberi facias*.

September 25.      Chief Justice Marshall delivered the opinion of the court.

1. One who enters as tenant for life cannot himself hold adversely to those in remainder, nor can those who enter under him.

Under instructions given by the court the jury found a verdict for plaintiff, and as that verdict, so far as it depends upon the commencement of the possession, and its nature and continuance, was certainly authorized by the evidence, the correctness of the verdict and judgment depends entirely upon the question whether the court, in giving and refusing instructions relating to the deed from David to Solomon White, and to the rights growing out of it, gave proper construction

and effect to that deed, and stated, correctly, the rights of the parties as affected by it? If the deed conveyed to Solomon White an absolute estate in fee so far as the grantor could convey such estate, then the statute of limitations, running in favor of a possession derived from, but adverse to him, and so continued for twenty years before his death, would bar a recovery by his heirs; and then also his deed to McIntyre, purporting to convey the fee, would be effectual for that purpose as against his heirs, and would cut off their title by descent. But if, as was decided by the court, and as the plaintiffs contend, the deed of David White conveyed to Solomon a life estate only, and upon his death vested the estate in them as being then his heirs, then neither the conveyance by the tenant for life, nor a possession derived from him, though nominally adverse, could operate against them during his life; because he could not transfer a more perfect or absolute right, either in the title or the possession, than he himself had, and because his transferee deriving the title or possession from him, and having only such as he had, holds under the same title as those in remainder, and cannot, any more than he himself could, defeat their title by claiming to hold adversely to them before their estate commences, and their right of possession and of action accrues.

By the deed thus brought in question, the grantor, David White, in consideration of love and affection for Solomon White, and for the further consideration of one dollar acknowledged to have been paid by him, "gives and grants to the said Solomon White during life, and then to his heirs or executors," a tract of three hundred and twenty-five acres, described by its boundaries, "to have and to hold the said tract or parcel of land unto the said Solomon White, his heirs, and executors, against the claim of said David White, his executors and administrators, unto the said Solomon during life, then to his heirs forever." Upon the face of the deed we think it entirely clear that the grantor intended to give to Solo-

*2. D. W., by deed "gives and grants to S. W., during his life, and then to his heirs or executors," a tract of 325 acres of land, described by its boundaries, "to have and to hold the said tract or parcel of land unto the said S. W. his heirs, and executors, against the claim of said D. W., his heirs, executors, and administrators,*

TURMAN
*vs.*
WHITE'S HEIRS.

unto the said
S. W. during
his life, then to
his heirs forev-
er." Held, that
this deed con-
veyed to S. W.
an estate for
life only in the
land, and upon
his death to his
heirs in fee.

mon White an estate for life only, and upon his death to give the land to his heirs. This intention is clearly expressed in the granting part of the deed. And although, in the *habendum*, it is first said to have and to hold said tract unto the said Solomon, his heirs, and executors, omitting the restrictive words, the clause goes on to show how the land is to be held, by the concluding words, "unto the said Solomon during life, then to his heirs forever." It thus goes back to the words of the limitation used in the granting part of the deed, the repetition of which is an emphatic evidence of the intention to restrict the estate of Solomon to his life; and coming after the words "unto the said Solomon White, his heirs, and executors," in the first part of the *habendum* clause, which are certainly sufficient if a fee was intended to pass to the grantee, would seem to be wholly useless, and their introduction inexplicable, unless for the purpose of qualifying the previous words, by reiterating the restriction upon the interest of Solomon, and re-asserting the grant to his heirs at his death; for the word "then" evidently means at the death, and not during the life of Solomon.

3. The rule
in Shelly's case,
which in effect
destroys the es-
tate intended
by the grantor
to be conveyed,
and converts a
life estate into
an estate in fee,
by which the
intention of the
grantor is de-
feated, has no
practical opera-
tion in Ken-
tucky.

It is not denied that upon the face of the deed this is the clear intention of the parties, and that if the deed is to have effect according to its plain language, and the obvious intention of the parties, Solomon White had but a life estate. But it is insisted that by an ancient and well settled rule of the common law, known as the rule in Shelly's case, "if a freehold (or estate for life,) be conveyed to a man, and by the same conveyance an estate is limited to his heirs or the heirs of his body, he will be vested with the fee or inheritance, and his heirs will take by descent, and not by purchase." This rule being based upon the fact, and in terms applicable to the case, of the estate being given to the first taker or immediate grantee for life, disregards and overrules the intention, however clearly expressed, that the first estate shall be limited to the life of the grantee. The rule operates by attaching to the estate for life the estate intended to be

a remainder, limited to the heirs, and by enlarging the estate of the ancestor from a life estate to a fee, it in effect destroys the estate intended for the heirs. Such at least is its effect in modern times, as well when the subsequent limitation is to "heirs of the body," as when it is to the "heirs" general of the first taker. And by the application of the rule the intention and object of the grant in both of its branches is defeated. Since he who was intended to be but a tenant for life, is, by being invested with the fee, enabled by ·alienation to deprive the heirs of the estate manifestly intended for them.

This celebrated rule, which is evidently one of policy and not of construction, seems to have been established by the courts of England in subserviency to the feudal policy prevailing at the time, and to the interest of the lords whose feudal rights of relief, wardship, marriage, &c., would attach upon an estate devolving by descent, but would not attach upon a transmission by purchase; and it may have been considered as a fraud, or as tending to produce frauds upon the rights of the lord, if land could be given to one for life, and afterwards, in the same conveyance, a further estate in the same land could be given to his heirs, to take as purchasers under the gift, and not as heirs by descent; and when the rule was adopted, heirs of the body were not deprived of all interest by putting the inheritance in the ancestor. The other reason sometimes given for the rule, that it subjected the land in the hands of the heir to the debts of the ancestor, seems to have no foundation in justice, except in those cases in which the ancestor had actually expended his means in the purchase of the land, which therefore ought not to be taken from his creditors for the benefit of his heirs—for instance, the creditors of Solomon White would not have been injured, and would have had no right to complain, if his father, instead of giving him a life estate in the land, had given the whole estate at once to his children or heirs; and if Solomon were the purchaser of

4. The rule in Shelly's case is a rule of policy, not of construction, and established in England in subserviency to the feudal policy prevailing at the time, and to the interest of landlords.

Turman
vs.
White's Heirs.

the fee, it would not at this day, require the rule in
Shelly's case to make the land liable for his debts.
But now the rule destroys the estate given to his heirs.
But whatever foundation the rule may have had,
either in policy or justice, it was maintained and en-
forced by the courts of England for centuries, and be-
ing thus a rule of property there it was brought to
America as a part of the common law by our emi-
grating ancestors, and was recognized and enforced
as such by the judicial tribunals of the older states.
But, although it may have become a rule of property
in those states as in England, it did not become any
where a rule either for framing conveyances or for
construing them after they were made. It may be
asserted with confidence that no man, not even a
scientific conveyancer, either in England or America,
intending to convey the fee simple to A. would, as a
means of effectuating that intention, convey the land
to A. for life, and then to his heirs. Such language
directly negatives the intention to convey a fee to A.,
and never would be adopted for that purpose unless
with a view to deceive. Nor can a rule which gives
to language, well understood in common use, an ef-
fect directly contrary to its commonly received import,
ever become familiar or acceptable or practically just.
To apply such a rule to the acts and transactions of
ordinary men, might enable the skillful and cunning to
make victims of the ignorant and unwary; and yet,
if entitled to the character of an established rule of
property in this state, the rule in Shelly's case must
have its effect upon deeds made before the adoption
of our Revised Statutes, and which make a case com-
ing within the rule.

If the effect which this rule gives to the limitations
to which it refers were in accordance with the com-
mon knowledge and common notions and transac-
tions of men, we should expect to have learned this
from our own observation, from our experience in the
business concerns of the community, and from our
professional practice and judicial investigations, and

5. The rule
in Shelly's case
has never been
adopted as a
rule of construc-
tion in Ken-
tucky; only one
case—Hum-
phreys v. Ayres,

we might be disposed to follow it without the authority of any judicial precedent of this state, if none were found against it. But as it is confessedly an arbitrary rule, out of the reach of common men, and not accordant with their notions of the meaning and effect of language; as it was founded upon a state of things which has not existed for centuries in England, and never in this state, and as it was intended to advance a policy at war with our institutions, and of which there never has been a trace in our state, it is only by the force of precedent, or at least of clear recognitions of its authority, that we should now apply the rule. As there is no reported case in which this court has applied the rule with the effect of determining by it the rights of property involved, it cannot be said to have become a rule of property here, and especially as we believe it has not been so considered and acted on in the community. A single manuscript decision, of recent date—*Humphreys v. Ayres, January* 1852— and withheld from publication as if of doubtful authority, presents the only instance referred to in which the rule has been directly applied and carried out by this court. And in the few cases in which its existence as a common law rule has been spoken of, the court, without any direct recognition of its authority as a binding rule here, but sometimes intimating the contrary, has evaded its application by seizing upon circumstances deemed sufficient to show that the case did not come within the rule. See *Prescott v. Prescott's heirs,* 10 *B. Monroe,* 56, and the cases there cited; also, *Black v. Cartmell,* 10 *B. Monroe,* 194.

In the case of *Prescott v. Prescott's heirs,* and the cases therein referred to, it will be seen that the application of the rule in Shelly's case, even where it is authoritative, depends upon the sense in which the word "heirs or heirs of the body" are used, in making the limitation to them after the estate for life given to their ancestor; and that if there be circumstances indicating with sufficient certainty that they were not intended to embrace the whole line of heirs in succession,

TURMAN
*vs.*
WHITE'S HEIRS.

*January,* 1852 —recognizes the principle; in other opinions of this court there are intimations to the contrary, and in other cases, where the rule has been referred to, the cases were decided on other points. *Prescot v. Prescot,* 10 *B. Monroe,* 52, and cases there cited; also *Black v. Cartmell,* 10 *B. Monroe,* 194.

but were used in a more restrictive and untechnical sense, and to point out such persons as would be heirs or heirs of the body of the tenant for life at his decease, the application of the rule is repelled by con-. struction of the gift. In the principal case then before the court, and·in some others referred to, the circumstance deemed sufficient to take the case out of the rule was, that after the gift for life the subsequent limitation was in substance to the heirs of her (or his) body, to be equally divided between them. In the case of *Black v. Cartmell*, the estate for life was equitable, and that given to the issue was adjudged to be legal, which difference was considered sufficient to repel the application of the rule; but in this last case the court, after stating this conclusion, goes on to say: "nor are we prepared to decide, even if this were not so, that the estate given expressly in trust to the mother for life should be enlarged by implication even into an equitable fee, since the effect would be to give to herself and husband an absolute power of disposition inconsistent with the general object of such a limitation." Which is in effect saying, that even if the nature of the two estates did not repel the application of the rule, the court was not prepared to enlarge the estate for life, that is, to apply the rule, because the intention and object of the provision would be thereby defeated.

The same reason would operate to repel the application of the rule in every case in which land is given to the ancestor expressly for life, and then or at his death to his heirs, since in every such case the enlargement of the estate for life into a fee would give to the ancestor an absolute power of disposition inconsistent with the object of the limitation; and the *dictum* quoted from *Black v. Cartmell*, if it is not a denial of the authority of the rule, shows at least that the court did not then recognize it as binding.

We may add that the 10*th section of the* 80*th chapter of the Revised Statutes, page* 541, following the Virginia revision, gives effect both to the limitation for

6. The 10*th* section of *chapter* 80, *Revised*

life and to the subsequnt limitation to the heirs; and although this recent statute cannot operate directly upon a deed made before its enactment, still it tends to show that the reason for refusing to give effect to such limitations had ceased, and that by such refusal the intention of the parties would be unnecessarily defeated. And we may presume, that if this court had at any time before the enactment of the Revised Statutes decided, that in case of a grant to one for life, and at his death to his heirs, the whole estate vested in the ancestor, and that his alienation had passed it from the heirs, a statute similar to that just referred to would at once have been enacted.

Whether the rule has been repealed or abolished in England we have not learned, and it is not material to inquire. But we know that by judicial decisions in England, as well as in the United States, it has been limited in its operation to those cases in which, upon the face of the instrument, the limitation to the heirs or heirs of the body, is to be understood as embracing the whole line of heirs in succession, and not as designating or referring to the persons who may come under that description at the death of the tenant for life; and as this is to be ascertained by construction of the instrument itself, and as the whole object of construction and of all the rules of construction, is to ascertain the intention of the parties to the instrument, in order that such intention so far as it is not inconsistent with the rules of law may be effectuated, we are not only at liberty to ascertain the actual intention as evinced by the words of the deed, but under the considerations which have been noticed, we feel bound to give to its terms a liberal and favorable interpretation, with a view to the effectuation of the intention and object of the limitation in question. And if the consequence of such construction be to repel the application of the rule in Shelly's case, not only from this deed but from all deeds in which the intention is clearly expressed, and by sufficient granting words, to grant the land to one for life, and at his

TURMAN
*vs.*
WHITE'S HEIRS.

*Statutes,* page 541, gives effect to the limitation for 'life, and to the subsequent limitation to the heirs, showing that in this country the reason for refusing to give effect to such a limitation does not exist.

7. The rule of construing instruments to carry out the intention is to be adhered to, and that intention carried out so far as it can be done consistent with the rules of law. 2 *B. Monroe,* 166; 12 *B. Monroe,* 156.

death to his heirs, and if this be such a restriction of the rule as amounts to a virtual abrogation of it, the abrogation will follow from the application of other rules more just and reasonable, equally well established in the common law, and more frequently and more certainly recognized and enforced in this state and by this court.

It is admitted that the word 'heirs' is susceptible of two interpretations—the one which is technical and embraces the whole line of heirs, the other not technical but common, by which it is used to denote the persons who may come under the denomination of heirs at a particular time, and it is often used in common speech as synonymous with children. If the use and interpretation of the word, as it stands in this instrument, would make the clearly expressed limitation to the heirs illegal and void, that is itself a reason under the settled rule of construction for giving to it, if it can reasonably be done, that interpretation which would make the limitation legal and valid, and thus effectuate the intention of the parties—*ut res magis valeat quam pereat.* It is to be recollected that we are now construing the instrument, and that the rule in Shelly's case is not a rule of construction, but it is to be applied only when the instrument, properly construed, presents a case coming within the rule according to its restricted interpretation: that is, taking the word heirs as used in the rule as embracing the whole line of heirs in succession; and the question is whether this word in the deed before us is to be taken or was used in that sense.

In the case of *Thompson v. Thompson*, 2 *B. Monroe*, 166, this court says: "The intention of the parties is a fundamental, and should be a governing principle in all cases;" and in *Moore v. Moore*, 12 *B. Monroe*, 656, the following language is used: "That expositions are to be made according to common intendment is agreed by all. To whatever instrument it may be giving construction, the words which have been employed by the author should be taken in the sense in

which he understood them, and in cases in which technical rules have been applied to particular expressions by the court, if we are satisfied after an examination of the instrument, those technical rules will not carry out but defeat the intention of the author, the technical rules must yield to the intention, and such a construction must be given as will effectuate it." Similar principles have often been announced and acted on by the court. But in the two cases referred to they were applied to the construction of words which were contended to be technical, and in the last case especially they were applied with the effect of rejecting the meaning and effect which, by a long train of decisions in England and in the United States, but not in Kentucky, had been given to the words, if he die without issue, introducing a devise over after a previous estate given by the same will. Under the authority of these and other cases in this court, and on the ground of the law of descents, and other laws and usages affecting the conveyance of estates, and the use of language for that purpose, we do not feel bound to give precisely the same interpretation to all words used in conveyances in this state as may have been given to similar words by the courts of England; and as the same reasons or motives which induced the establishment of the rule in Shelly's case, doubtless operated also to induce such a construction of the words used in conveyances as to bring them, if possible, within the scope of the rules, this consideration, with the fact that the operation of the rule necessarily disregards or defeats the intention of the instrument, furnishes an additional and powerful reason for rejecting the authority of those cases which determine the insufficiency of particular circumstances or words, to reduce the sense of the word "heirs" from its technical to its more restrictive and common meaning, as to which there is a diversity in the English decisions.

In the deed before us the grant is to Solomon White expressly, during life and then to his heirs, &c. Taking the word 'then' to mean at his death, the grant to

8. A conveyance to one during life, and *then* to his heirs;

Turman
vs.
White's Heirs.

gives the first
taker a life es-
tate, and his
heirs at his
death the fee.

the heirs is to take effect at the death of Solomon, and according to its terms takes effect in favor of those who are then his heirs. And as this restrictive sense of the word "heirs" is not only indicated by the word 'then,' meaning at his death, but will make the limitation consistent with the rule, and give effect to the whole instrument according to the evident intention of the grantor, we should adopt that interpretation of the word if necessary for this purpose, and especially as it is evident that the writer of the deed was not skilled in legal phraseology.

But the word "heirs" is susceptible of another interpretation, which would make the limitation consistent with the rules, and that is, to take it as meaning children, with which it is known to be commonly or at least frequently used as synonymous by persons unskilled in the legal sense of words. In the case of *Harper v. Wilson*, 2 *A. K. Marshall*, 466, the court says the popular sense of the words "if I die without heir," or "if I have any heir," implies dying without or having a child or heir of the body, and is given effect to in the clause in the popular rather than in the legal sense. And the opinion, in effect, announces the same principle as that already extracted from the cases of *Thompson v. Thompson*, and *Moore v. Moore*. As in the case of *Harper v. Wilson* the court knew the popular sense of the word "heir," in the context of that will, so we know that heirs, when used in reference to a living person, as the ancestor means in its popular sense, children who are in fact heirs apparent. And as Solomon White had children at the date of the deed, we suppose the word heirs was used in the sense of children. If the word children had been used the limitation would have been valid above all exception; and it would seem to be sporting with the actions and interests of men, to say, with respect to an instrument drafted by an ordinary man, without legal knowledge or skill, that if he had used the word children the limitation would have been altogether effectual, but that by using the word heirs, though in its popular sense,

synonymous with children, and therefore presumably used as meaning children, the limitation is void and wholly ineffectual for the purpose manifestly intended. There is no difference in this case in the affect of the word heirs, whether understood in one or the other of the restricted meanings just noticed.

Without extending further this opinion, already greatly protracted, we are of opinion that there is no error to the prejudice of the defendant in the opinions of the court in giving and refusing instructions, and as we perceive no error in other respects, therefore, the judgment is affirmed.